UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

VALERUS COMPRESSION SERVICES L.P.,

    Plaintiff,

v.                                        Case No. 10-C-517

LONE STAR TRANSPORTATION, LLC,

    Defendant.

---

**DECISION AND ORDER PARTIALLY GRANTING
LONE STAR'S MOTION FOR SUMMARY JUDGMENT**

---

This case arises under the Carmack Amendment to the Interstate Commerce Commission Act, 49 U.S.C. § 14706 (2005). Valerus Compression Services, LP seeks compensation in the amount of $357,467 for damage to a shipment of natural gas compressor frames that Valerus purchased from GE Oil & Gas. Defendant Lone Star Transportation, LLC, was the carrier that was retained to transport the frames from GE's facility in Oshkosh, Wisconsin to Valerus' facility in Odessa, Texas. The frames were damaged during transit in a single vehicle accident on June 23, 2008. Lone Star has moved for summary judgment on the ground that Valerus' claim is untimely under the bill of lading that governs the transaction. Alternatively, Lone Star argues that its liability is limited by the bill of lading to $55,000. Valerus, on the other hand, argues that Lone Star's bill of lading does not apply, but if it does, that its claim was timely. For the reasons set forth below, the Court concludes that the bill of lading applies and that Lone Star's liability is therefore limited, but that Valerus' claim is timely. Accordingly, Lone Star's motion will be granted in part.

**FACTS**

Between 2008 and 2009, Valerus purchased compressor frames from GE that were used in the manufacture of natural gas compressors which it then sold to its customer, Pemex. The frames were manufactured by GE in Oshkosh, Wisconsin, and then transported to Valerus' facility in Odessa, Texas. While Valerus generally relied on its suppliers to arrange such transportation, GE's shipping charges were apparently too high for Valerus. (DPFOF, ¶¶ 17, 18.) Valerus solicited quotes from three other carriers and ultimately selected Lone Star – a carrier with which Valerus was already familiar. (*Id.* ¶ 19.)

The shipping arrangement between Valerus, Lone Star and GE was relatively informal. Valerus and Lone Star did not enter into a written shipping agreement. (DPFOF ¶ 21.) Because GE's manufacture of the components was ongoing, batches were shipped as they were completed. (PPFOF, ¶ 4.) GE initiated each shipment by sending an email to Lone Star (copied to Valerus) when the components were ready. Lone Star would then arrange for a truck to pick up the shipment at GE in Oshkosh and transport them to Valerus' facility in Odessa. (*Id.*)

Between January 2008 and April 2009, Lone Star carried a total of 89 shipments from GE's facility in Wisconsin to Valerus's facility in Texas. For each shipment, GE prepared and issued a standardized document titled "Straight Bill of Lading." This document identified GE as the shipper, Lone Star as the carrier, and Valerus as the consignee. (*Id.* ¶¶ 25-28.) The bill of lading also stated that the frames being shipped by GE were received by Lone Star "subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading . . . .," certified that GE as the shipper was "familiar with all the bill of lading terms and conditions in the governing classification," and

2

confirmed that "said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns." (*Id.*) The bill of lading also included two notes that state:

> Note 1: Shipper's Valuation Certification – Some commodities are subject to classes that are dependent upon released value (a limitation of the Carrier's liability in the event of loss or damage). In such cases, it is essential that this certification be completed at time of shipment to ensure the assessment of the correct transportation charges.
>
> Note 2: Carrier's Value Limitation Statement – This statement on the bill of lading is to alert the shipper that the carrier may have limitations of liability published or contained in its tariffs or rate schedules. Such information will be furnished to the shipper upon request.

(*Id.*) There was also a space for GE to declare a maximum value of the property being shipped before signing the document. (*Id.*) That space was left blank on each invoice.

Throughout the entire period of time that Lone Star carried shipments for GE to Valerus, Lone Star maintained a Tariff which limited Lone Star's liability in the event of loss or damage to cargo to "$2.50 per pound for each article, but not to exceed $100,000 per shipment (the Released Value)," "unless the shipper declared in writing an agreed or declared value for the property at the time of acceptance or the written rate quotation or on the bill of lading at the time of shipment." (DPFOF ¶ 32.) Lone Star's Tariff also included a section entitled "Contract Terms and Conditions," that stated in pertinent part:

> As a condition precedent to recovery, claims must be filed in writing . . . within nine months after the delivery of property . . . except that claims for failure to make delivery must be filed within nine months after a reasonable time for delivery has elapsed . . . .
>
> Where claims are not filed . . . in accordance with the foregoing provisions, no carrier shall be liable, and such claims will not be paid.

3

(*Id.*) On at least three occasions before Lone Star began carrying GE's shipments to Valerus, Lone Star notified Valerus by letter that Lone Star's liability in the event of loss or damage to cargo would be limited according to the terms of Lone Star's Tariff. (DPFOF ¶ 8-12.) Despite the facts that GE's standardized bill of lading specifically referenced Lone Star's Tariff and that Lone Star notified Valerus of the limitation of liability in its Tariff, neither GE nor Valerus asked Lone Star for a copy of Lone Star's Tariff prior to February 2010.

On June 18, 2008, Lone Star picked up a shipment of frames from GE's facility in Oshkosh to be transported to Odessa. (*Id*. ¶ 50.) Like the other shipments, GE issued a bill of lading, listing the serial numbers of ten frames. (*Id.*) The weight of the frames was listed as 22,000 pounds, and the space for a declared value was left blank. (*Id.* ¶¶ 31, 33.) While in route to Odessa, on June 23, 2008, the shipment of frames was severely damaged in a single-vehicle accident. (*Id.* ¶¶ 35-36).

Immediately following the accident, Lone Star and Valerus engaged in multiple communications. Within a week, Lone Star notified Valerus of the accident and hired a claims adjuster to inspect and photograph the damage. (*Id.* ¶¶ 37, 51.) On July 8, 2008, Valerus sent two email messages to Lone Star referencing "GE Frames/Kansas Accident." (Aff. of Lindsey Hargrove, Ex. G.) In the first email, Valerus employee Jodie Jarvis requested a copy of the adjuster's report regarding the damage to the frames and stated: "If the frames are returned to GE for their inspection and repair, we must first get authorization and acceptance from GE to receive and to partner with your insurance company for their repair and/or replacement." (DPFOF ¶ 39.) In her second email, Jarvis again inquired about the adjuster's report and the need for agreement with GE as to payment: "Before the frames are returned to GE there must be an agreement between GE and your insurance company as to who is responsible for the cost of the inspections, repairs or

4

replacements." (DPFOF ¶ 40.) Lone Star returned the damaged frames to GE that same day. (DPFOF ¶ 41.)

On February 9, 2009, GE notified Lone Star that the ten damaged frames were ready for delivery to Valerus. Lone Star picked up the shipment and delivered it to Valerus on February 13, 2009. (DPFOF ¶¶ 43,44.) After July 8, 2008, there was no communication between Lone Star and Valerus regarding the damaged compressor frames until February 24, 2010, when Valerus emailed Lone Star to inquire about "the status of the claim." (*Id*. ¶ 46.) Lone Star denied the claim on the ground that Valerus failed to submit to Lone Star a claim for the damaged frames within the time allowed. Valerus thereupon commenced this action.

## STANDARD OF REVIEW

The court is required to grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 447 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## DISCUSSION

The Carmack Amendment ("Carmack") to the Interstate Commerce Commission Act, 49 U.S.C. 14706, governs liability of a common carrier to a shipper for loss of, or damage to, an

5

interstate shipment. *North American Van Lines, Inc. v. Pinkerton Sec. Systems, Inc.*, 89 F.3d 452, 455 (7th Cir. 1996). Prior to its enactment, the liability of carriers for loss of, or damage to, interstate shipments was governed by a patchwork of state and federal law that bedeviled both shippers and carriers. *Adams Express Co. v. Croninger*, 226 U.S. 491, 505 (1913). The purpose of Carmack was "to remove the uncertainty surrounding a carrier's liability when damage occurs to a shipper's interstate shipment." *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987). In relevant part, the Carmack Amendment states that a "carrier providing transportation…[is] liable to the person entitled to recover under the receipt or bill of lading." 49 U.S.C. § 14706(a)(1). However, the Amendment does allow a carrier to limit its liability "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper." 49 U.S.C. 14706(c)(1)(A). The Carmack Amendment also permits the carrier to set a time limit of not less than nine months for filing claims. § 14706(e)(1). Claims not filed within the time allowed are barred. 49 C.F.R. § 370.3(a).

Here, Lone Star argues that Valerus' claim is barred because Valerus failed to file a claim with Lone Star within nine months of the loss. Lone Star further argues that even if Valerus' claim is found to be timely, Lone Star's liability is limited to the Released Value of $55,000 since the shipper failed to declare a different value. In response, Valerus argues that Lone Star's Tariff does not apply since Lone Star did not issue the Bill of Lading. If Lone Star's Tariff is found to be applicable, Valerus argues alternatively that its claim is not barred because it was timely submitted to Lone Star.

**I.     GE's bill of lading applies.**

The threshold issue in this case is whether GE's standard form document entitled "Straight Bill of Lading" binds Valerus to Lone Star's terms and conditions. Valerus argues that it does not

because it was issued by GE, not Lone Star. Valerus argues that the Carmack Amendment, by its plain language, requires the carrier to issue a bill of lading for property it receives for transport. *See* 49 U.S.C. § 14706(a)(1) ("A carrier providing transportation or service . . . shall issue a receipt or bill of lading for property it receives for transportation under this part."). Since the bill of lading was issued by GE instead of Lone Star, Valerus argues that Lone Star's tariff and conditions do not apply.

The fact that GE prepared the bill of lading is immaterial. Indeed, the Carmack Amendment states expressly that "[f]ailure to issue a receipt or bill of lading does not affect the liability of the carrier." § 14706(a)(1). What is important is that a bill of lading was prepared and signed by the shipper and accepted by the carrier. "A bill of lading is a contract between the carrier and the shipper." *OneBeacon Ins. Co. v. Haas Industries, Inc.*, 634 F.3d 1092, 1098 (9th Cir. 2011). Here, the bill of lading prepared and signed by GE expressly states that the shipment received by Lone Star was "subject to the classification and tariffs in effect on the date of the issue of this Bill of Lading . . . ." (DPFOF ¶ 27.) As the consignee of the goods shipped, Valerus stands in the shoes of GE, the shipper. *Harrah v. Minnesota Min. and Mfg. Co.*, 809 F. Supp. 313, 318 (D. N.J. 1992) ("Plaintiff, as a consignee, is bound by the tariff in effect for the transaction between 3M [the shipper] and RPS [the carrier]."). The fact that the bill of lading was prepared by GE provides an even stronger reason to hold GE and its consignee to its terms. *See Hughes Aircraft Co. v. North American Van Lines, Inc.*, 970 F.2d 609, 612 (9th Cir. 1992) ("Here, Hughes had such reasonable notice and an opportunity to make a deliberate, thoughtful choice in selecting North American's liability limit because it drafted the contract and directly negotiated its terms. The party responsible for drafting the contract is ordinarily charged with knowledge of its terms and meaning."); *see also*

7

*Swift Textiles, Inc. v. Watkins Motor Lines, Inc.*, 799 F.2d 697, 704 (11 Cir. 1986) ("If the shipper's agent thereby incorporated an industry-wide, indisputably legal, and federally sanctioned statute of limitations, the shipper cannot now be heard to complain about it.").

Valerus argues that the bill of lading is unclear as to whose classifications and tariffs it incorporates. Valerus accuses Lone Star of twisting the language of the bill of lading into a reference to and incorporation of its own terms and conditions. (Br. In Opp. at 9.) But Valerus offers no alternative construction of the language. If GE was not referencing and incorporating Lone Star's classifications and tariffs, whose was it incorporating? Once again, it bears mention that a bill of lading is in essence a contract, and general principles of contract interpretation are applied when construing it. *OneBeacon Ins. Co.*, 634 F.3d at 1098. Among those principles is the rule that ambiguities are construed against the drafter. *See BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 361 (7th Cir. 2009) (citing Indiana law). Here, the only reasonable construction of the bill of lading is that it referenced and incorporated the classifications and tariffs of the carrier, which in this case was Lone Star.

Valerus also notes that Lone Star's own tariff provides that the "driver's signature on any bill other than the uniform bill of lading or carrier's bill of lading simply acknowledges receipt of a shipment." (Br. in Opp. at 9) (citing DPFOF ¶ 32, LST 549). Thus, Valerus argues, by the terms of Lone Star's tariff, "the GE bill of lading does not have any force and effect other than acknowledging receipt of goods–it does not implement Lone Star's tariff." (*Id.*) But this language simply prevents Lone Star from being bound to language it never agreed to; it cannot be used by a shipper to avoid the standard terms and conditions of the carrier's own classifications and tariffs that are incorporated into the very contract that the shipper prepared and signed.

8

Valerus next argues that the GE bill of lading's reference to "tariffs in effect" is meaningless because no carrier has had any "tariff in effect" since the enactment of the ICC Termination Act of 1995. (*Id.*) But this change in the law did not eliminate the carrier's ability to limit its liability through the use of tariffs. Congress replaced the tariff requirement with the mandate that the motor carrier "provide to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices, upon which any rate applicable to its shipment or agreed to between the shipper and carrier is based." 49 U.S.C. § 13710(a)(1); *see Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1063 (7th Cir. 2000) (citing *Jackson v. Brook Ledge, Inc.*, 991 F. Supp. 640, 645 (E.D.Ky.1997)); *see also Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030 (7th Cir. 2000) ("Today carriers adopt standard contractual terms, which some call "tariffs" out of habit, but which have no effect apart from their status as contracts. Landstar's bill of lading probably should have been revised to say that it incorporates 'standard terms' rather than 'tariffs in effect'; had it done this, Landstar could have avoided Tempel's argument that no tariff is 'in effect' today and that Landstar's therefore should be ignored. But it is clear what the bill of lading was getting at, so we read its language as incorporating off-the-rack terms."). Lone Star met the requirement of § 13710(a)(1): it made its classifications and tariffs available to GE, and Valarus as well, upon request. Lone Star is therefore entitled to enforce its terms, notwithstanding the failure of either Valerus or GE to request a copy of the terms either before or after they began using Lone Star to transport the frames. It therefore follows that Valerus, as consignee, is subject both to the nine-month claim limitation and the limitation of liability that are contained in Lone Star's Tariff.

**II.     Valerus' claim was timely.**

GE's bill of lading, by incorporating Lone Star's terms and conditions, includes a requirement that claims for damage to property must be filed with the carrier within nine months

9

after delivery. Where delivery is not made, the claim must be filed within nine months after a reasonable time for delivery has elapsed." (DFOF, ¶ 32.) This claim limitation is authorized by the Carmack Amendment, which states that "[a] carrier may not provide a period of less than 9 months for filing a claim against it." 49 U.S.C. § 14706(e)(1). Lone Star argues that because Valerus failed to submit a claim within the required nine month period, its claim is now time-barred. Valerus, on the other hand, argues that Jodie Jarvis' July 8, 2008 emails to Lone Star are sufficient to meet the claim requirement.

The minimum requirements for a claim are set out by regulation. The regulation provides that a claim consists of:

> A written or electronic communication (when agreed to by the carrier and shipper or receiver involved) from a claimant, filed with a proper carrier within the time limits specified in the bill of lading or contract of carriage or transportation and:
>
> (1) Containing facts sufficient to identify the baggage or shipment (or shipments) of property,
>
> (2) Asserting liability for alleged loss, damage, injury, or delay, and
>
> (3) Making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provisions for filing claims embraced in the bill of lading or other contract of carriage; Provided, however, That where claims are electronically handled, procedures are established to ensure reasonable carrier access to supporting documents.

49 C.F.R. § 370.3(b).

The Seventh Circuit has refused to strictly apply a carrier's claim limitation, however, when the carrier has full knowledge of the circumstances the notice is intended to provide. *See Hopper Paper Co. v. Baltimore & O. R. Co.*, 178 F.2d 179, 181 (7th Cir. 1949) (noting that the general rule is that the "failure to give notice of a claim for damages or loss in accordance with a stipulation in

a contract for the shipment of goods is excused, or is inapplicable, where the carrier has or is chargeable with actual knowledge of all the conditions as to the damages that a written notice could give"). In *Hopper Paper*, a load of paper was destroyed by fire in a train wreck, and the carrier railroad argued that the action against it was barred by the carrier's nine-month claim limitation because the shipper failed to submit a written claim until almost a year after the accident. Noting that the purpose of the notice requirement is not to allow the carrier to escape liability but to facilitate prompt investigation of claims, the Court held that the requirement must be reasonably applied. *Id.* at 182. It would not be practical, the Court concluded, to allow a carrier to avoid liability because the shipper's failed to provide notice of a claim the carrier already knew about:

> In the instant case it is undisputed that defendant and its agents were fully aware and cognizant of the existence of all the facts concerning the wreck and destruction of the carload of paper. In such a situation a formal notice by plaintiff to the defendant could not have accomplished anything more. Hence, we conclude that the carrier may not use the provisions of the bill of lading to shield itself from the liability imposed upon it by the statute and the common law for its negligent destruction of the shipper's property. To hold otherwise would not be construing the bill of lading 'in a practical way.'

*Id.* (quoting *Georgia, Fla. & Ala. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 198 (1916)).

Similarly, in *Wisconsin Packing Co, Inc. v. Indiana Refrigerator Lines, Inc.*, 618 F.2d 441 (7th Cir.), the Court held that the shipper's letter to the carrier refusing to accept the return of a shipment of meat that had been rejected by the consignee because it was above the allowable temperature was sufficient to satisfy the requirement of a claim for damages for the loss caused by the carrier. When construed in a practical way, the Court concluded that the shipper's letter

> clearly represented an attempt to formalize the claim inherent in plaintiff's refusal to take back the meat and its oral assertions that defendant was at fault. It thus sufficed to advise the carrier that the shipper was seeking reimbursement for the loss. It is incontrovertible that the notice identified the goods by reference and set

11

> forth a formal statement of the damage. It is also apparent that the carrier not only was aware of the need to investigate, but actually conducted a thorough inquiry. Moreover, since the carrier had itself spent three days unsuccessfully endeavoring to dispose of the meat, it knew at least as well as the shipper what the maximum loss could be. Thus within a few days of the damage defendant had all the information necessary to protect its interests in the face of plaintiff's claim. Accordingly, the August 2 letter was an adequate statement deemed to satisfy this (written claim) requirement of the bill of lading.

*Id.* at 444 (internal quotations omitted). In holding the shipper's letter sufficient, the *Wisconsin Packaging* Court noted that "courts have been more liberal in finding compliance with a claim procedure as the carrier's actual knowledge of the facts surrounding the claim increases." *Id.* at 446. "Such an approach," the Court observed, "not only reflects a practical understanding of how a prudent carrier should and would construe a written notice when it is fully aware of the circumstances and extent of loss, but also comports with the equities of the situation." *Id.*

*Hopper Paper* and *Wisconsin Packaging* support Valerus' argument that Jarvis' emails were sufficient under the circumstances to satisfy the requirement of a written claim. As in those cases, the carrier here was fully aware of the circumstances giving rise to the loss. Indeed, Lone Star knew of the damage before Valerus did and provided notice of the accident to Valerus. Lone Star was also able to investigate the loss and in fact hired a claims adjuster to investigate the accident and substantiate the damage with a report and photographs. And Valerus' assertion that Lone Star was liable for the cost of replacement or repair of the frames, to the extent is was not obvious to Lone Star, is implicit in Jarvis' directions that Lone Star get GE to "partner with your insurance company for their repair and/or replacement." (DPFOF 39.) The fact that the written claim was submitted electronically in the form of email, as opposed to paper, did not prejudice Lone Star and would seem of no consequence.

12

It is true that Jarvis' emails do not specify the amount of loss or damage for which Lone Star was liable. The specific amount of damage was obviously unknown at the time. The fact that the claim did not specify the amount of the claim, however, does not make it invalid. As the Court noted in *Wisconsin Packaging*, "a shipper often does not know the extent of the damage until long after delivery and must therefore have the opportunity to file a supplemental notice." 618 F.2d at 445. More recently, the Third Circuit observed in *Lewis v. Atlas Van Lines, Inc.*, that the claim need not specify the amount of the damage; it is sufficient if it indicates a "determinable amount of money." 542 F.3d 403, 409 (3rd Cir. 2008) (quoting 49 C.F.R. § 370.03(b)(3)). To be determinable, the Court held, "all that is required is that the claim provide enough information to make it possible to assign a dollar amount to the claim at some point after the claim itself is filed." *Id.* at 409. Jarvis' emails met this standard. They made clear that the amount of the claim would be whatever GE charged to repair or replace the damaged shipment. Lone Star therefore had all the information it needed to determine what the specific amount of the claim would be.

I conclude therefore that Valerus' email communications to Lone Star well within the nine-month period were sufficient to satisfy the requirements of 49 C.F.R. § 370.3(b), and that Valerus' claim, though limited by Lone Star's Tariff, is not barred. Accordingly, Lone Star's motion for summary judgment is granted in part and denied in part. The parties are directed to advise the Court within the next ten days whether any issues remain or whether judgment should be entered in favor of Valerus for $55,000, together with statutory costs.

**SO ORDERED** this __15th__ day of August, 2011.

                                                    s/ William C. Griesbach
                                                  William C. Griesbach
                                                  United States District Judge